UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CG & JS ENTERPRISES, LLC, ET AL. | CIVIL ACTION |
| VERSUS | NO: 14-1322 |
| H&R BLOCK, INC., ET AL. | SECTION: "A" (1) |

## ORDER AND REASONS

The following motion is before the Court: **Motion for Summary Judgment (Rec. Doc. 72)** filed by defendant H&R Block Tax Services, LLC. Plaintiffs CG & JS Enterprises, LLC, Christopher Gibbens, and Johnny Shaw oppose the motion. The motion, submitted for consideration on November 1, 2017, is before the Court on the briefs without oral argument. For the reasons that follow, the motion is GRANTED.

I.  **BACKGROUND**

Plaintiffs Christopher Gibbens and Johnny Shaw own the legal entity, CG & JS Enterprises, LLC, also a plaintiff herein. Both Gibbens and Shaw were employed by H&R Block Tax Services, LLC ("HRB") as district managers. Gibbens resigned his employment with HRB in January 2013 under amicable circumstances. (Rec. Doc. 72-2, Def. Exhibit 1, Gibbens 1/23/13 email to Ricks).

In April 2013, HRB franchisee David Sewell contacted HRB to advise that he and his wife wished to terminate their HRB franchise (DAP Technologies, LLC) due to financial burdens. (Rec. Doc. 72-8, Def. Exhibit 7, Sewell 4/28/13 email to Casey). Shaw contends that Sewell approached him about purchasing the franchise and he

became immediately interested due to the economic potential of DAP's location. (Rec. Doc. 101-3, Pla. Exhibit 1, Shaw Affidavit). According to Shaw, he and Sewell reached an agreement but Sewell couldn't simply transfer his franchise agreement to a purchaser; HRB had a contractual right of first refusal to purchase the franchise and any new franchisee would have to be approved by HRB.

Meanwhile, Shaw had continued his employment with HRB but apparently not without difficulty. In May 2013 Shaw received an unfavorable performance appraisal from his supervisor. (Rec. Doc. 72-3, Def. Exhibit 2, Johnson 5/30/13 email to Shaw). Shaw had also filed a charge of racial discrimination and harassment against his immediate supervisor, Calvin Ricks, and HRB.[1]

In late May and early June 2013, Ms. Stacy Tyler with HRB was working with Sewell to assist him in completing the steps necessary to sell the franchise. (Rec. Doc. 101-5, Pla. Exhibit 4, Tyler emails to Sewell). The record contains an HRB Letter of Intent (LOI) to Transfer Franchise dated May 30, 2013, which was executed in part by Sewell and in part by Shaw. (Rec. Doc. 72-10, Def. Exhibit 9).

On June 8, 2013, Tyler emailed Shaw directly to ask him to confirm that he was going to move forward with purchasing the franchise from Sewell so that the paperwork could be sent to legal. (Rec. Doc. 101-6, Pla. Exhibit 5, Tyler 6/8/13 email to Shaw). Shaw responded in the affirmative, and within minutes Tyler replied: "I do not believe

---

[1] The copy of the EEOC charge attached to Plaintiffs' opposition as Exhibit 19 is illegible so the Court does not know when the charge was filed. (Rec. Doc. 101-20). The filing date is not material, however. The salient fact pertaining to the charge is that it was pending when Shaw ultimately resigned his employment.

you can be both a franchise owner and employed by the company. Is this something you are aware of?" (Rec. Doc. 101-22, Pla. Exhibit 21, Tyler 6/9/13 email to Shaw). Shaw replied, "yes."[2] (*Id.*). Less than one hour later Ms. Tyler emailed:

> Just sn [sic] FYI, ***your resignation is contingent upon approval***. Therefore, it is important that your field leader be aware of your desire to become a franchisee and that if you are approved you would want to coordinate a transition plan, etc.
>
> If we're in the same page, I'll proceed with the LOI so company can look at FROR.

(Rec. Doc. 101-7, Pla. Exhibit 6, Tyler 6/9/13 email to Shaw) (emphasis added).

On June 28, 2013, Ms. Lori K. Potts-Wisner sent Shaw numerous documents to be completed as a potential buyer of the DAP franchise. (Rec. Doc. 72-11, Def. Exhibit 10, Potts-Wisner 6/28/13 email to Shaw). The transmittal states that the documents were needed "to prepare the final approval package for review by the Market VP." (*Id.*).

On July 1, 2013, an employee with HRB advised Shaw that HRB would not be pursuing its right of first refusal to purchase the DAP franchise. (Rec. Doc. 101-9, Pla. Exhibit 8, High 7/1/13 email to Shaw).

Apparently Shaw had decided to voluntarily resign because on July 29, 2013, Ms. Geri Sutter sent Shaw a Confidential Separation and Release Agreement for his consideration and approval. (Rec. Doc. 72-7, Def. Exhibit 6). Shaw executed the

---

[2] In his affidavit Shaw suggests that he found Tyler's comment confusing because he knew that other HRB employees had been allowed to own a franchise. Shaw attributed Tyler's statement to the fact that he had filed an EEOC complaint. (Rec. Doc. 101-3, Pla. Exhibit 1, Shaw affid. ¶¶ 8-11). The Court cannot discern from the email chain how much time elapsed between Tyler's question and Shaw's unequivocal "yes" response. The Court notes that there is no evidence in the record to suggest that Tyler knew about the EEOC complaint when she emailed Shaw.

Release and his termination date was going to be August 2, 2013. The Release, which has been filed under seal, details the mutual promises that HRB and Shaw agreed to, including that Shaw would voluntarily resign from HRB and settle his pending EEOC claim in exchange for a significant lump sum monetary payment. (Rec. Doc. 72-4, Def. Exhibit 3). Shaw received the monetary consideration. (Rec. Doc. 72-5, Def. Exhibit 4, Pay Summary). The detailed Release contains no promise related to or reference whatsoever to Shaw's efforts to purchase the DAP franchise.[3]

The record demonstrates that during September 2013, communications between Christopher Gibbens and Potts-Wisner continued (Rec. Docs. 72-12 & 72-13, Def. Exhibits 11 & 12), and on September 13, 2013, Potts-Wisner emailed Gibbens and Sewell that she had received final approval for the franchise transfer and would begin to prepare the contract documents.[4] (Rec. Doc. 72-14, Def. Exhibit 13). On September 18, 2013, Potts-Wisner mailed the contract documents to Shaw at a Denham Springs address. (Rec. Doc. 72-16, Def. Exhibit 15). The transmittal letter contains the following admonition:

> We are required by law to provide you with these documents no less than seven calendar days prior to closing. Therefore, if you receive this package on September 19, 2013, the first date which you may return the original signed documents it [sic] to me is September 27, 2013, but not before that date.

---

[3] On July 29, 2013, Shaw emailed the release to Gibbens and asked him to have one of his attorney friends review the document. (Rec. Doc. 101-19, Pla. Exhibit 18, Shaw 7/29/13 email to Gibbens).

[4] On September 5, 2013, Mr. Robert Moretti of HRB approved the transfer. (Rec. Doc. 101-21 SEALED, Pla. Exhibit 20, Moretti 9/5/13 email to Potts-Wisner).
   In his deposition Gibbens attaches much significance to the use of the term "final" in this email. (Rec. Doc. 72-9, Def. Exhibit 8, Gibbens depo at 125).

(*Id.*).

The transmittal letter also contained a reminder that a $2500 deposit check would be due along with the executed documents.

The Transfer Closing Checklist sheet contains the following annotation:

CLOSING ON (or) AFTER: <u>SEPTEMBER 27, 2013</u>.

(*Id.* at PL PROD EX 7 0008). None of the closing documents had been signed by HRB.

On September 26, 2013, Mr. Brant Wilson with HRB sent a letter/email to Shaw and Gibbens stating that

> Upon further consideration, H&R Block has decided to withdraw its approval of the transfer and hereby withdraw its indication of interest in entering into a franchise agreement with you or your company for that location.

(Rec. Doc. 72-18, Def. Exhibit 17). This bad news was preceded by a telephone call from Chris Lewis with HRB who told Shaw and Gibbens about HRB's change of heart.[5] (Rec. Doc. 72-6, Def. Exhibit 5, Shaw depo at 89). It is undisputed that the withdrawal occurred before either Shaw or Gibbens received the closing documents in the mail.[6]

Plaintiffs filed this lawsuit against HRB and although their pleading does not specify specific causes of action, HRB has identified four potential legal theories: 1) breach of contract; 2) detrimental reliance; 3) tortious interference with a contract; and

---

[5] Although the reasons for the revocation are not material to any issue presented by HRB's motion, Plaintiffs suggest that Calvin Ricks, Shaw's former supervisor and the subject of the prior EEOC complaint, killed the deal. (Rec. Docs. 101-13-14, Pla. Exhibits 12-14, Ogle/Ricks 9/13/13 email chain). HRB suggests that the deal was cancelled when it learned that Plaintiffs were trying to solicit HRB employees to work for them. (Rec. Doc. 72-17, Def. Exhibit 16, Ogle/Fasullo/Smith email chain).

[6] The documents were mailed to Shaw but at Gibbens' Denham Springs address. Gibbens had been out of town at the time so neither Shaw nor Gibbens had received the closing documents before the withdrawal occurred. (Rec. Doc. 72-6, Def. Exhibit 5, Shaw depo at 88).

4) impermissible use of EFIN codes.[7] Plaintiffs' claims are for the most part grounded on two contentions—that the September 18, 2013 transmittal of the closing documents constituted an irrevocable offer, and that Shaw resigned his position based on the assurance that he would receive his own franchise.

This matter is scheduled to be tried to the bench on May 22, 2018. HRB now moves for summary judgment on all of Plaintiffs' claims.

## II. DISCUSSION

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic

---

[7] Plaintiffs do not dispute HRB's characterization of the claims.

argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the ` record in search of evidence to support a non-movant's position. *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

### ***Breach of Contract***

Plaintiffs' breach of contract claim fails as a matter of law. It is undisputed that the franchise documents were never executed. Louisiana Civil Code article 1947, entitled Form Contemplated by Parties, states:

> When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form.

The numerous emails and transmittals from the summer of 2013 demonstrate that neither party would be bound until the final contract document was executed by the parties. In fact, the contract package expressly refers to a "closing." Nothing suggests that the written contract documents were a mere flourish. And perhaps most damaging to Plaintiffs' position is that the franchise contract itself specifically provides that it shall not be binding on either HRB or the franchisee "unless and until this Agreement has been executed by Franchisee and by an executive officer of [HRB]." (Rec. Doc. 72-16,

Def. Exhibit 15, FLA ¶ 32).

Further, Plaintiffs misread *Rainey v. Entergy Gulf States, Inc.*, 35 So. 3d 215 (La. 2010), when they suggest that HRB's signature on the contract was superfluous simply because HRB drafted the document. The contract in this case clearly contemplated that it would be executed by Plaintiffs and HRB.[8] This case does not involve a situation as in *Rainey* where a document is drafted by one party but contains a single signature space for the receiving party.[9]

Plaintiffs argue that HRB lost the right to revoke the offer of a franchise when it placed the closing documents in the mail. Plaintiffs contend that the offer remained irrevocable until at least September 27, 2013, the first day that the closing documents could be executed after allowing for the seven day forbearance period imposed by federal law.[10] Under Louisiana law, an offer that specifies a period of time for acceptance is irrevocable during that time. La. Civ. Code art. 1928. When the offeror manifests an intent to give the offeree a delay within which to accept, without specifying a time, the offer is irrevocable for a reasonable time. *Id.* An offer not irrevocable under

---

[8] In fact, the record does not suggest that Plaintiffs actually manifested their intent to enter into the contract by executing it and forwarding the $2500 deposit check to HRB. In their briefing Plaintiffs make reference to a fee that was wrongly deducted from their bank account for several months but that appears to be something other than the $2500 check due on signing.

[9] An example of a document of this nature would be the Release that Shaw signed. HRB drafted the document and while the agreement is a contract between Shaw and HRB, the Release contains a signature space for Shaw only. No one from HRB signed the bilateral contract but HRB is clearly bound by it. Again, the franchise document contemplates and expressly requires execution by all parties.

[10] The September 27, 2013, was simply Potts-Wisner's estimation of when the seven day forbearance period would expire if Plaintiffs had received the closing documents in the mail on September 19, 2013.

Civil Code article 1928 may be revoked before it is accepted. La. Civ. Code art. 1930.

Nothing in any of the communications or the closing documents manifests an intent by HRB to create an irrevocable offer by specifying a time period for acceptance. Plaintiffs' suggestion that the offer was irrevocable until at least September 27th based on the forbearance period is unpersuasive because the forbearance period leading up to September 27th was the timeframe during which the offer could *not* be accepted under any circumstances. HRB (as required by law) gave Plaintiffs a time period during which the offer could not be accepted and therefore made the offer acceptable beginning on September 27, 2013. But this does not equate to specifying a time period or delay *after* September 27th during which the offer would stand open.[11]  Simply, the offer was revocable on September 26, 2013.

For the foregoing reasons, HRB is entitled to judgment as a matter of law on the breach of contract claim.

### *Detrimental Reliance*

On the basis of the same facts giving rise to their breach of contract claim, Plaintiffs contend that they are entitled to relief under the doctrine of detrimental reliance. To establish a claim for detrimental reliance, a party must prove three elements by a preponderance of the evidence: 1) a representation by conduct or word; 2) justifiable reliance; and 3) a change in position to one's detriment because of the

---

[11] Another insurmountable problem for Plaintiffs is that even as to an irrevocable offer, the acceptance is only effective *when received by the offeree*. La. Civ. Code art. 1934. Thus, regardless of what Plaintiffs did or did not receive in the mail, and regardless of what they did or did not execute on their own, until the executed documents along with the $2500 deposit check had been received by HRB during the "reasonable period" of irrevocability, no contract would be formed. Plaintiffs, understandably believing it to be a futile gesture, did not do this.

reliance. *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 59 (La. 2005) (citing *Lakeland Anesthesia, Inc. v. United Healthcare of La. Inc.*, 871 So. 2d 380, 393 (La. App. 4th Cir. 2004)); La. Civ. Code art. 1967. Proof of an enforceable contract is not necessary to the claim. *Id.* (citing *Babkow v. Morris Bart, PLC*, 726 So. 2d 423, 429 (La. App. 4th Cir. 1998)).

Shaw's contention is that he was promised a franchise and that he resigned his position with HRB based upon this promise. None of the evidence of record even remotely suggests that Shaw was promised a franchise as a quid pro quo for his resignation. And while Shaw's October 17, 2017 affidavit states that Ms. Geri Sutter assured him in no uncertain terms that once he resigned and settled the [EEOC] claim, he would be approved as a franchisee," (Rec. Doc. 101-3, Pla. Exhibit 1, Shaw affid. ¶ 13), his deposition testimony given under oath on June 7, 2016, belies that assertion. When questioned during his deposition about when and how the promise of a franchise was made, Shaw was far less certain about any of the facts surrounding the alleged assurance. (Rec. Doc. 72-6, Def. Exhibit 5, Shaw depo at 56-58).

Shaw places much emphasis on Tyler's June 9, 2013 email to him, which is quoted in full earlier in this opinion. Shaw contends that Tyler's statement that "your resignation is contingent upon approval" means that if he were to resign, he would be approved for a franchise. The sentence may mean that approval for a franchise is contingent upon resignation—an interpretation that would be consistent with the rest of Tyler's emails. While the phrase, which Tyler emailed from a mobile device, makes little sense as written, it does not suggest that resignation guarantees a franchise, which is

the construction Shaw is urging.

But even assuming that Ms. Sutter had the apparent authority to promise Shaw a franchise if he resigned,[12] the Release agreement that Shaw signed when he voluntarily resigned deprives his reliance of any indicia of reasonableness. The Release is comprehensive and it details the consideration that Shaw would receive for voluntarily resigning. (Rec. Doc. 72-4, Def. Exhibit 3, Release). The Release does not allude to a franchise and it specifically precludes claims based on promises not contained in the document (*Id.* ¶ I). The Release specifically states that its written terms are the "entire agreement" between HRB and Shaw. (*Id.* ¶ H). Considering the importance that Shaw now claims to have placed on the alleged promise of a franchise, it would have been patently unreasonable to execute the Release, which included no references to a potential franchise opportunity. The express terms of the Release defeat Shaw's detrimental reliance claim.

Gibbens has no claim for detrimental reliance. Gibbens has not demonstrated how he detrimentally changed his position in light of the franchise offer. Gibbens had resigned his position with HRB well before Sewell decided to sell the franchise. Gibbens has likewise failed to demonstrate that he sustained damages as a result of the withdrawn offer.

HRB is entitled to judgment as a matter of law on the detrimental reliance claims.

---

[12] The Court does not know what position Ms. Sutter held with HRB so the Court cannot judge one way or the other whether reliance on any promise that she made regarding a franchise would be reasonable.

### *Tortious Interference With Contract*

Plaintiffs do not dispute that Louisiana law does not recognize a claim for tortious interference with a contract by a corporate entity like HRB. HRB is entitled to judgment as a matter of law on this claim.[13]

### *Impermissible Use of EFIN Code*

Plaintiffs claim that HRB continued to use IRS-assigned EFIN numbers linked to their names even after they left HRB.[14] Plaintiffs have failed to demonstrate that any aspect of federal or state law gives them a cause of action related to EFIN numbers. HRB is entitled to judgment as a matter of law on this claim.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 72)** filed by defendant H&R Block Tax Services, LLC. Is **GRANTED**. Plaintiffs' claims are dismissed with prejudice.

November 14, 2017

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

---

[13] Plaintiffs assert that they made a tortious interference claim against other individual defendants in their second amended complaint. (Rec. Doc. 101-1, Opposition at 21). They go on to state that the complaint has not yet been answered, and that once the Court rules on "the motion regarding the efficacy of plaintiffs' filing of the second amended complaint, plaintiffs will revisit this portion of the motion." The Court notes that no motion has been filed to address the efficacy of the second amended complaint, which Plaintiffs attempted to file in November 2015. (Rec. Doc. 55). This pleading purports to add new parties to this lawsuit, which is scheduled to be tried on May 22, 2018.

[14] Anyone who files a tax return with the IRS must have an EFIN. (Rec. Doc. 72-9, Def. Exhibit 8, Gibbens depo at 116).